UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                 :

          - v. -                 :        S4 05 Cr. 673 (LAP)

MAHMUD FARUQ BRENT,                       :
    a/k/a "Mahmud Al Mutazzim,"
                 Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## SENTENCING MEMORANDUM


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America


JENNIFER G. RODGERS
KARL METZNER
VICTOR L. HOU
Assistant United States Attorneys,
    Of Counsel.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                      :

              - v. -                          :          S4 05 Cr. 673 (LAP)

MAHMUD FARUQ BRENT,                           :
        a/k/a "Mahmud Al Mutazzim,"
                        Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### <u>SENTENCING MEMORANDUM</u>

Defendant Mahmud Faruq Brent, a/k/a Mahmud Al Mutazzim, is scheduled to be

sentenced on Tuesday, July 10, 2007 at 4:00 p.m.  The Government respectfully submits

this Sentencing Memorandum to set forth its view of the appropriate sentence to be

imposed on Brent.  As determined by the Probation Office in its Presentence Investigation

Report ("PSR"), Brent's sentencing range under the United States Sentencing Guidelines

is 180 months, following his guilty plea to Count Three of Indictment S4 05 Cr. 673

(LAP) (the "Indictment").[1]

-----------------------

[1] Count Three of the Indictment charged Brent with participating in a conspiracy to
provide material support to a designated foreign terrorist organization, in violation of 18
U.S.C. § 2339B.  The parties agreed in a plea agreement dated March 28, 2007 that the
final offense level was 35 and the applicable criminal history category was VI.  The
parties also stipulated that, because this would lead to a United States Sentencing
Guidelines ("U.S.S.G.") range of 292 to 365 months' imprisonment, above the statutory
maximum penalties applicable to the count of conviction (which was 180 months), the
stipulated sentence in this case was 180 months.

                                                              (continued...)

Brent's admitted conspiracy involved him traveling from the United States to Pakistan to obtain military-style terrorist training at a camp run by the foreign terrorist group Lashkar-e-Taiba ("LET").  Once in Pakistan, Brent spent weeks at the LET camp, learning everything from how to use automatic weapons to how to build bombs.  When Brent's training was finished, he returned to the United States, and waited for the time and place to put his terrorist training to use.

In light of his efforts to make himself into a deadly terrorist operative with unfettered access to the United States, Brent should receive a sentence of 180 months' imprisonment, which is the maximum permitted by his count of conviction.  Even that sentence is dramatically below that called for under the United States Sentencing Guidelines ("U.S.S.G.") range that would otherwise apply.  Accordingly, Brent should receive neither a downward departure nor a variance from the Sentencing Guidelines under Section 3553(a), and should receive a sentence of 180 months.

---

[1](...continued)

The Probation Office calculated that Brent's final offense level was 37, based on an additional two-level enhancement pursuant to U.S.S.G. § 2M5.3(b)(1)(E), because the offense involved the provision of material support or resources with the intent, knowledge, or reason to believe that they would be used to commit or assist in the commission of a violent act, namely Brent's provision of himself as a trained jihadist fighter to be used as LET requested.  (PSR ¶ 51).  This would result in a Guidelines range of 360 months to life imprisonment.  Because the Guidelines sentence is limited to 180 months, however, the change in final offense level did not affect the Probation Office's recommended sentence.

**BACKGROUND**

**A.      Brent's Offense Conduct**

Prior to his travel to Pakistan for terrorist training, Mahmud Brent was a martial

arts student, who studied with co-defendant Tarik Shah for several years.  As was

established at the trial of co-defendant Rafiq Sabir, Shah was an accomplished martial

arts instructor who trained dozens of Muslims in jujitsu and hand-to-hand combat.  Shah

also urged many of his students to prepare for violent jihad against the infidels.

Between approximately 2001 and 2005, Brent trained with Shah at mosques in

Beacon, New York, and Poughkeepsie, New York, and often stayed with Shah.  Brent

and his friend Terence Bland, a/k/a "Siddique," invited Shah to teach stick fighting and

hand-to-hand combat to over a dozen Muslim students at schools in Maryland and

Virginia.  Shah was accompanied during some of these classes by his close friend Rafiq

Sabir.  During these martial arts classes in Virginia and Maryland, Shah spoke about the

need to be prepared for jihad and spoke about the struggles Muslims faced in Kashmir,

Chechyna, and elsewhere.  Shah considered Brent to be one of his most committed and

talented students.  At the recent trial of Brent's co-defendant, Rafiq Sabir, Bland testified

that Shah showed a jihadi recruiting video, the "Martyrs of Bosnia," to Brent and Bland

while they stayed at Shah's house in Beacon.  Terrorism expert Evan Kohlmann has

described the Martyrs of Bosnia as the most successful jihadist recruiting and propaganda

video ever made.  The Martyrs of Bosnia includes graphic footage of combat and

3

encourages viewers to wage jihad in, among other places, Kashmir, Chechnya, and Palestine, and glorifies those fighters who have died fighting.

Brent was connected to a group of Muslims in the Virginia/Maryland area known later as "the Virginia Jihad Network."  Members of the Virginia Jihad Network included Randall Royer, Seifullah Chapman, Ibrahim al Hamdi, Mohammad Aattique, and Yong Ki Kwon, among others.  Members of the Virginia Jihad Network were committed to the path of violent jihad and frequently attended lectures by Ali al Timimi, a radical cleric based in Falls Church, Virginia.[2]

Virginia Jihad Network members received combat and firearms training, and also participated in mock combat fighting using paintball weapons to simulate real firearms. Several members of the group, including Chapman and Royer, received combat training at a terrorist training camp in Pakistan run by  Lashkar el-Taiba ("LET")[3] and fired many

---

[2] Al Timimi was convicted by a jury in the Eastern District of Virginia for conspiring to levy war against the United States, assisting the Taliban, and various firearms-related offenses, and on July 13, 2005, was sentenced to life imprisonment, in connection with Indictment No. 04 Cr. 385 (LMB).

[3] On or about December 24, 2001, the United States designated LET a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act. That designation remains in effect.  LET, whose name roughly translated means "Army of the Pure" or the "Army of the Righteous," claims to have trained thousands of mujahideen to fight in multiple areas including Afghanistan, Kashmir, Bosnia, Chechyna, Kosovo, and the Philippines.  LET has operated training camps in Pakistan for training mujahideen from around the world.  Following the terrorist attacks of September 11, 2001, several electronic bulletin board-type messages were sent, with headlines linking directly back to the LET Web site, in which an LET spokesperson, "Abu Osama," stated, in substance:  "Lashkar-e-Taiba will not leave Afghan brethren in the lurch.  They will

(continued...)

types of weapons, including rocket propelled grenades ("RPGs"). Chapman worked at a Muslim organization in Virginia which, among other things, helped to coordinate trips for Muslims making the pilgrimage to Mecca and Medina in Saudi Arabia (i.e., the "hajj"). With Chapman's assistance, Virginia Jihad Network members traveled to Saudi Arabia, ostensibly for this purpose. In March 2000, Chapman provided a letter of support for Brent's application for an expedited passport to travel to Saudi Arabia. Some members of the Virginia Jihad Network who traveled to Saudi Arabia were met by representatives of LET who attempted to recruit them to go to LET camps.

Following the September 11, 2001 terrorist attacks on the World Trade Center and the Pentagon, al Timimi urged his followers in a secret meeting to leave the United States immediately and to prepare to fight a jihad against Americans invading Afghanistan in response to the September 11 attacks. Four members of the group, including Kwon and Aattique, agreed to go fight against the American forces and traveled to a terrorist training camp operated by LET in Pakistan. The group members intended to aid the Taliban regime in Afghanistan and to fight against the United States.

Yong Ki Kwon, who later pled guilty and cooperated with the United States Attorney's Office for the Eastern District of Virginia (and testified at multiple trials against other Virginia Jihad Network members), traveled to an LET camp in Pakistan. To

---

[3](...continued)

sacrifice their lives along with other Muslims against America and other disbelievers in case they attack Afghanistan. Lashkar-e-Taiba is intended to uphold the flag of Islam by jihad in the battlefield."

gain entrance to the LET camp, Kwon received a reference from other group members who had previously attended the camps.  On September 21, 2001, Kwon flew to Pakistan and traveled to the LET office in Lahore, Pakistan.  An LET propaganda poster of the type that was displayed in LET's Lahore office shows a mujahideen's hands carrying the LET flag and his boot standing on an upside down American flag with an image of a falling bomb on the burning American Capitol building.  From LET's office in Lahore, Kwon traveled by caravan into the mountains of Pakistan to one of LET's training camps for foreign fighters.  Kwon and his associates received training for approximately 45 days.  During Kwon's training, he received survival skills, physical training, target practice with different firearms and RPGs, and learned combat commands and tactics. During his training, foreigners, like Kwon, were brought back from the mountains and back to the Lahore office.  The foreign students learned that the American forces in Afghanistan were making significant progress and that LET was not going to send foreign fighters into Afghanistan since the border with Pakistan had been closed.  One day after arriving in Lahore, Kwon and other students were brought to an LET location in Muridke. Eventually, Kwon and others were brought back to Lahore where they were asked by LET leaders whether they would be willing to perform unspecified operations back in the United States.  Kwon left Pakistan in November 2001.

Similarly, Mahmud Brent's primary contact to gain entrance to the LET training camp was Chapman.  To reach the LET camp, Brent took the same steps as Kwon, who

6

had preceded him at the camps by only three months.  According to Brent's passport, he traveled to Lahore, Pakistan, on February 25, 2002, and departed from Lahore, Pakistan, on or about June 4, 2002.   Telephone records establish contact between Brent and Chapman, as well as between Brent and al Hamdi, another member of the group to attend an LET training camp, in the months prior to Brent's departure.  Shah also had Chapman's name and telephone number at his residence in May 2005 and referred to Chapman on several occasions during his conversations with an undercover FBI agent posing as an al Qaeda recruiter in 2004 as someone he knew had gone to a training camp overseas.[4]

On May 28, 2005, at the direction of the FBI (and during a brief interval when Tarik Shah agreed to cooperate with authorities after his arrest), Shah met with Brent at a hotel room in Maryland.  This meeting was monitored and recorded by the FBI.  Brent and Shah specifically discussed Brent's experience going to a camp with the "fighters"/the "mujahideen," up in the "mountains."  Brent told Shah that he was inspired to travel by, among other things, Shah himself, and the Martyrs of Bosnia videotape that he had seen first at Shah's house.  Shah told Brent that he wanted to "travel"  (*i.e.*, to attend a foreign training camp) and Brent responded that his "connections" were "kinda gone," in light of what had been happening in the community and that his only "connect"

---

[4] Shah also made repeated references to his student Brent during his recorded conversations with the undercover agent posing as an Al Qaeda recruiter.

7

was "doing time now."[5]  Brent explained that he never really "knew names" since that was the "way that they had it set up" over there and that, at the time he went to the camps, everything was "really organized."  Brent described the difficulties he encountered in reaching the "camps" and the process by which he was able to find a connection to get into the camps, although he told Shah that he would not "mention" his connection's name to Shah.  Brent encouraged Shah to travel overseas to the camps and told Shah that it was a question of "how much" Shah was willing to "sacrifice" and whether Shah was willing to "take a risk."  When Shah inquired whether Brent had stayed in the city, he responded that he had not been in the cities but had been up in the "mountains" training "and stuff" with "the mujahideen, the fighters."  Brent stated that because of "treaties with Bush," it became dangerous for "foreigners," like Brent, to stay in the camps, and so they moved him around from safehouse to safehouse.  Brent also stated that he had agreed to provide whatever "assistance" he could over there and expressed his hope that Allah would bless him for his efforts.  Finally, Brent told Shah that he would never "go back" on his decision to go to the camps and that it was "one of the better decisions in my life."

At the time of Brent's arrest on August 4, 2005, the FBI conducted a court-authorized search of his residence.  The agents recovered, among other things, a copy of

---

[5] On March 4, 2004, Chapman and two of his co-conspirators were convicted in the Eastern District of Virginia of charges related to their provision of support to LET, Indictment No. 03 Cr. 296 (LMB).  At his trial, Chapman testified and admitted that he had attended an LET training camp in or about 2001.  Chapman was sentenced to 85 years' imprisonment, which he is currently serving.

the Martyrs of Bosnia video, multiple books about martial arts training, and audiotapes of lectures by Anwar Al-Awlaki[6] and Ali Al Timimi.  In addition, agents also recovered Brent's computer, which was analyzed at the FBI's computer laboratory.  FBI technicians were able to recover Internet histories detailing some of the Web sites that Brent visited during the relevant time frame in the months leading up to Brent's travel to the LET camp.  For example, Brent logged onto a Web site called "SafeWeb," which is a program intended to disguise the Internet web sites visited by a user.  After using the Safe Web feature,  Brent made repeated visits to jihadist Web sites such as Azzam Publications (a publisher of jihadist literature and the producer of the Martyrs of Bosnia videotape) and Qoqaz.  The Web sites visited by Brent had articles such as "The Islamic Ruling on the Permissibility of Martyrdom Operations," "How do I train Myself for Jihad?" and the "The Islamic Ruling on the Permissibility of Executing Prisoners of War."  Brent also visited Web sites which provided up to date battlefield reports about the jihad in Chechnya.  Brent visited a Web site for "Jihad Training Camps" which listed the address, e-mail address, and telephone number for LET's office in Lahore, Pakistan.  This Web page also noted to visitors that "If you have exhausted the above resources to no avail and you still desire to fight the enemies of Allah, please e-mail us and we will make

---

[6] According to the 9/11 Commission, Awlaki was the spiritual advisor to two of the September 11 hijackers, Khalid Almihdar and Nawaf Alhazmi, who began attending al-Awlaki's mosque in San Diego, California, and later in Falls Church, Virginia. Lectures by Awlaki were also seized during searches of the residences of Shah and Sabir.

arrangements for you at a training camp, insha-allah."  Brent also visited LET's Web site on multiple occasions.  After visiting the LET Web site, Brent also visited Web sites advertising Navy SEAL conditioning training and State Department travel information about Pakistan, and made inquiries about accommodations in Lahore, Pakistan, the city in which the LET office is located.

## B.   Brent's Guilty Plea

On April 2, 2007, Brent appeared before the Honorable Douglas F. Eaton in Magistrate's Court to plead guilty to the Indictment.  (4/2/07 Plea Transcript ("Tr.")).  Brent was sworn and was asked a lengthy series of questions designed to determine whether he was competent to plead guilty and whether he understood and knowingly and voluntarily waived certain of his rights.  The plea agreement between the parties was summarized, and Brent was asked specifically whether he understood and agreed with certain portions:  namely, that he stipulated that the stipulated sentence was 180 months; and that he would not appeal any sentence at or below 180 months.  (Tr. 7-13).  Following a thorough colloquy, the Court asked Brent to describe his criminal conduct.  With the assistance of his counsel, Brent indicated that he had traveled to Pakistan between 2001 and 2005 where he knowingly attended a terrorist training camp called Lashkar-e-Taiba, that he knew at the time he attended the LET camp that LET had been designated as a foreign terrorist organization, and that while at the camp he and other individuals received military and terrorist training.  (Tr. 18-19).

# DISCUSSION

Brent's only presentencing submission states that he has reviewed the PSR and has "no objections to same." (7/12/07 Abdellah Ltr. to Court). As a result, Brent is not requesting a downward departure from the otherwise applicable sentencing guidelines range, or a sentence less than 180 months based on the factors enumerated in 18 U.S.C. § 3553(a). This Court's own review of the § 3553(a) factors will likewise lead to the conclusion that there is no basis to impose a sentence other than 180 months.

There are no valid bases for departure or variance from the sentence to which the parties stipulated in the plea agreement. Indeed, the stipulated sentence of 180 months is already a significantly lower sentence than is called for by the advisory Guidelines. Notably, under both the Probation Department's and the parties' calculations, Brent's Sentencing Guidelines range would be well in excess of 180 months: the Probation Department calculated Brent's Guidelines sentence as 360 months to life, while the parties agreed that Brent's Guidelines sentence was from 292 to 365 months' imprisonment. Accordingly, the stipulated sentence of 180 months is eminently fair given Brent's offense conduct and personal history, with consideration of the § 3553(a) factors, and the Court should impose a sentence of 180 months on Brent.

## A.    Procedure for Determining Brent's Sentence

While the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that

11

Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 453 U.S. 220, 252 (2005).  In furtherance of that goal, judges are required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' § 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) (main ed. and Supp. 2004)." *Id.* at 260.

In sentencing defendants, district courts should consider the factors set forth in 18 U.S.C. § 3553(a).  This provision provides that the sentencing "court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed—

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct;

        (C)    to protect the public from further crimes of the defendant;

        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effect manner;

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the sentencing range

established [in the Sentencing Guidelines];

(5)    any pertinent policy statement [issued by the Sentencing Commission];

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

In *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), the Second Circuit explained that district courts should now engage in a three-step sentencing procedure in light of *Booker*.  First, the court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."  *United States* v. *Crosby*, 397 F.3d at 112.  Second, the court should consider whether a departure from that Guidelines range is appropriate.  *Crosby*, 397 F.3d at 112.  Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)" and determine the sentence to impose.  *Id.* at 113.  A failure to consider the Guidelines range and to instead simply select a sentence without such consideration is error.  *Id.* at 115.

**B.**    **Brent's Sentencing Range is 180 Months**

The Probation Office determined that Brent's sentencing range under the Guidelines is restricted to 180 months, due to the statutory maximum sentences applicable to the count of conviction.  (PSR ¶ 98).  Brent does not object to the Probation Office's Guidelines calculations, and, in fact, stipulated to the resulting 180-month sentence in the

13

parties' plea agreement.  As noted above, this sentence is significantly lower than the 292 to 365 months that Brent would have faced absent the statutory maximums in place for the crime to which Brent pled guilty.  Moreover, Brent greatly benefitted by his plea agreement with the Government, as this agreement permitted Brent to plead guilty to a single count of conspiracy to provide material support to terrorism.  Had Brent been convicted of both the conspiracy and substantive material support violations, he would have been exposed to a 30-year sentence by statute, leaving ample room for almost all of the Sentencing Guidelines range of 292 to 365 months.

**C.     Brent Is Not Entitled to Any Departures from the Guidelines**

The Probation Office notes no grounds that would warrant a departure from the prescribed sentencing guidelines.  Brent has stipulated that no departures are appropriate, and has not sought a downward departure under the Sentencing Guidelines.

**D.     The Factors Set Forth in Section 3553(a) Warrant a Sentence of 180 Months**

The factors set forth in 18 U.S.C. § 3553(a) do not support variance from the 180-month stipulated sentence.  Indeed, these factors further demonstrate that the appropriate sentence in this case is that to which the parties stipulated as reasonable and the Probation Office recommended – 180 months.

**1.     The Nature and Circumstances of the Offense and Brent's History**

The nature and circumstances of the offense weigh overwhelmingly in favor of a 180-month sentence.  Brent's crime involved traveling to Pakistan to receive terrorist

military training from a designated foreign terrorist organization, and then returning home to await his opportunity to put his training into action. As such, Brent's crime falls comfortably within the heartland of the terrorism-related activities that Congress has sought to punish severely and deter. Terrorists set up and operate training camps to indoctrinate and train individuals who will then act as the foot soldiers in the terrorist group's war against the United States and its allies. Without men who, like Brent, are willing to offer themselves to act as terrorist fighters, groups like LET would lack the ability to act out their violent beliefs. What makes terrorist organizations like LET different from mere political or advocacy organizations is their willingness and ability to act on their beliefs by staging violent attacks. Brent, by training as he did for the kind of violent jihad he believed in supporting and by returning to the United States fully trained to carry out a terrorist attack, became a critical component of LET's ability to put its murderous views into action.

Brent's conduct is therefore fully deserving of a 180-month sentence, which is well below the Guidelines range established by the Sentencing Commission for the type of conduct in which Brent engaged.

In anticipation of sentencing, Brent's counsel submitted supportive letters from friends and family members, emphasizing Brent's personal attributes and their personal relationships with him. These letters request that the Court consider Brent's family and the impact Brent's incarceration will have on them in imposing sentence. The

Government submits, however, that such considerations should not result in a sentence below the stipulated sentence of 180 months.  While it is certainly unfortunate for Brent's family members that he will be imprisoned and unable to spend substantial time with them, those are the consequences of his criminal actions.  There is nothing about Brent's family situation—and Brent does not claim otherwise—that in any way explains or illuminates his criminal behavior.  And, the defendant's family situation, while regrettable, is one shared with the majority of criminal defendants.  Brent is not unique in having family members who depend on him, and he provides no rationale for why his family situation should lead to a lower sentence in this case.  Accordingly, Brent's family circumstances should not be a basis for lowering Brent's sentence pursuant to § 3553(a).

     2.      **The Need for the Sentence Imposed to:**

          a.      **Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

As explained above, the seriousness of the offense is such that a sentence of 180 months is the only appropriate sentence in this case.  The Probation Office concurs, recommending that Brent be sentenced to a prison term of 180 months.  As far as just punishment is concerned, the United States Sentencing Commission dictated that the crimes to which Brent pled guilty should result in a sentence of at least 292 to 365 months, substantially in excess of that to which Brent is exposed.  Accordingly, the appropriate sentence here is 180 months.

          b.      **Afford Adequate Deterrence**

In the Government's view, a sentence of 180 months is necessary to ensure deterrence, particularly in a case like this one where the defendant has not demonstrated any remorse for his crimes.  Accordingly, there is no reason to sentence Brent to less than the stipulated sentence because of an assumption that he does not need to be deterred from future problematic conduct.

### c.	Protect the Public from Further Crimes of the Defendant

In the Government's view, a sentence below the stipulated sentence based on this factor would be inappropriate.  There is no reason to believe that Brent, a hardened graduate of a terrorist training camp, has reformed such that a lesser sentence is warranted.

### d.	Provide Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

This factor should be irrelevant to the Court's analysis.

### 3.	The Kinds of Sentences Available

This factor is not at issue because Brent is facing mandatory imprisonment.

### 4.	The Kinds of Sentence and the Sentencing Range Established in the Sentencing Guidelines

This factor weighs heavily in favor of a 180-month sentence.  As explained above, Brent's Sentencing Guidelines range is 292 to 365 months, a sentence well above the stipulated sentence of 180 months.  Accordingly, Brent already has received a tremendous benefit from his plea agreement in this case by having his sentence capped at 180 months.

17

5.      **Pertinent Policy Statements Issued by the Sentencing Commission**

The policy statements issued by the Sentencing Commission present no basis to reduce Brent's stipulated sentence of 180 months.

6.      **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

Typically, the individuals most similarly situated to a particular defendant tend to be his co-defendant(s), who are often charged with the same or similar conduct.  Brent's co-defendants in the original indictment, Tarik Shah and Rafiq Sabir, have yet to be sentenced, but each faces a substantial sentence.  Shah faces a stipulated sentence of 180 months' imprisonment for pleading guilty to material support charges, with a Sentencing Guidelines range well above that, and Sabir, having been convicted at trial of two material support counts, faces a statutory maximum sentence of 30 years, with a Sentencing Guidelines range that will likely be determined to be at or above that figure. Abdurrahman Farhane, who was charged in the same indictment as Brent and ultimately pleaded guilty to money laundering and false statements charges, received a sentence of 13 years' imprisonment.  Accordingly, a 180-month sentence is well in line with sentences received by Brent's co-defendants.

Moreover, a survey of some cases in which defendants were convicted of material support crimes, reveals that most have received significant prison sentences.[7]  *See,*

---

[7] This non-exhaustive list was compiled with the assistance of the Department of
(continued...)

*e.g.*, *United States* v. *Paracha*, 03 Cr. 1197 (SHS) (S.D.N.Y.) (material support

conviction at trial resulted in 30-year sentence); *United States* v. *Abu Ali*, No. Crim.A. 05-

53-GBL (E.D. Va.) (material support conviction at trial resulted in 30-year sentence);

*United States* v. *Haouari*, S4 00 Cr. 15 (JFK) (S.D.N.Y.) (material support conviction at

trial resulted in 24-year sentence); *United States* v. *Khan*, No. Crim. 03-296-A (E.D. Va.)

(material support convictions at trial for various members of Virginia Jihad network

resulted in sentences of 10 years for material support counts, in addition to sentences

ranging from 55 years to life on other counts); *United States* v. *al-Moayad and Zayed*,

(E.D.N.Y.) (material support and other convictions at trial resulted in sentences of 75

years and 45 years, respectively); *United States* v. *Lakhani*, (D.N.J.) (material support and

other convictions at trial resulted in sentence of 47 years); *United States* v. *Gamarra-

Murillo* (M.D. Fla.) (material support and weapons conviction on guilty plea resulted in

25-year sentence); *United States* v. *Faris* (E.D. Va.) (material support conviction on

guilty plea resulted in 20-year sentence); *United States* v. *Battle* (D. Ore.) (material

support charge but seditious conspiracy guilty plea resulted in sentence of 18 years).

This list does not account for every material support sentence in the United States,

and there are certainly some defendants (including many who have signed cooperation

agreements with the Government) who have received lesser sentences. What this non-

---

[7](...continued)
Justice's Counterterrorism Section, which coordinates and assists in federal terrorism
prosecutions nationwide.

exhaustive sampling does convey, however, is that courts tend to treat such cases very seriously, imposing lengthy prison sentences on those defendants conspiring or attempting to provide, or providing material support to a terrorist organization – defendants who are similarly situated to Brent.

**7.     The Need to Provide Restitution to Any Victims of the Offense**

This factor is not at issue in this case.

## CONCLUSION

The factors set forth in Section 3553(a) overwhelmingly establish that Brent should receive a sentence of 180 months, the stipulated sentence in this case, which is well below the applicable Sentencing Guidelines range for his crimes.

For all of the foregoing reasons, the Court should sentence Brent to a term of 180 months' imprisonment.

Dated:        New York, New York
              July 23, 2007

                              Respectfully submitted,

                              MICHAEL J. GARCIA
                              United States Attorney


                              /s/_____
                              Jennifer G. Rodgers
                              Karl Metzner
                              Victor L. Hou
                              Assistant United States Attorneys
                              (212) 637-2513/2476/2408