**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**UNITED STATES OF AMERICA**          **:**

          -v.-                   **:**

**RAFIQ SABIR,**              **:**        **S4 05 Cr. 673 (LAP)**
     **a/k/a "the Doctor,"**

                         **:**

          **Defendant.**

                         **:**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL OR ACQUITTAL


                                  **MICHAEL J. GARCIA**
                                  **United States Attorney for the**
                                  **Southern District of New York**

**KARL METZNER**
**JENNIFER G. RODGERS**
**Assistant United States Attorneys**

     -  **Of Counsel –**

## POINT I

### The Court Should Deny Sabir's Motion For A New Trial And For A Judgment Of Acquittal As Untimely

Under the Federal Rules of Criminal Procedure, Rule 33(b)(2), "any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty." Similar language appears in Rule 29(c)(1), which provides that "[a] defendant may move for a judgment of acquittal . . . within 7 days after a guilty verdict or after the court discharges the jury, whichever is later." The Advisory Committee notes for the 2005 amendment to Rule 33 (which are mirrored by those to Rule 29) further explain that:

> . . . the Committee believed that the rule should be amended to be consistent with all of the other timing requirements in the rules, which do not force the court to act on a motion to extend the time for filing within a particular period of time or lose jurisdiction to do so.
>
> Accordingly, the amendment deletes the language regarding the court's acting within seven days to set the time for filing. Read in conjunction with the conforming amendment to Rule 45(b), the defendant is still required to file a timely motion for a new trial under Rule 33(b)(2) within the seven-day period specified. The defendant may, under Rule 45, seek an extension of time to file the underlying motion as long as the defendant does so within the seven-day period. But the court itself is not required to act on that motion within any particular time. Further, under Rule 45(b)(1)(B), if for some reason the defendant fails to file the underlying motion for new trial within the specified time, the court may nonetheless consider that untimely underlying motion if the court determines that the failure to file it on time was the result of excusable neglect.

1

(Emphasis added).  Under Rule 45(b)(1)(B), "[w]hen an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made . . . after the time expires if the party failed to act because of excusable neglect."

Although none of Rules 29, 33 or 45 defines "excusable neglect," courts apply an equitable test that considers all relevant circumstances, including: (1) the danger of prejudice to the non-moving party, (2) the length of delay and impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the moving party, and (4) whether the moving party acted in good faith.  See Williams v. KFC Nat'l Management Co., 391 F.3d 411, 415 (2d Cir. 2004) (citing Pioneer Inv. Services Co. v. Brunswick Assoc. L.P., 507 U.S. 380, 395 (1993)).

Under the Rules and the relevant case law, Sabir's motions under Rules 29 and 33 should be denied as untimely for several reasons.  First, after already asking for and receiving a generous extension of 45 days in which to file his post-trial motions, Sabir has now delayed nearly three months since the verdict in his case.  Sabir did not ask for an extension of his time to file these motions within the 45-day period that he had been granted.  The Government has a significant interest in the finality of the verdict and in getting Sabir sentenced.  Moreover, as time goes by, the likelihood of trial witnesses becoming unavailable increases.  Accordingly, it is at least possible that the Government would be prejudiced by the defendants' delay in filing this new trial motion.

Second, Sabir provides no reason for his significant delay in filing these motions.  As the motions contain no alleged new evidence, filing the motions was entirely within the control of the defendant.  Moreover, the proffered bases for a motion for a new trial or a judgment of acquittal do not present "good cause" for this Court to entertain such a motion.  The first of these issues was raised in some fashion by defense counsel at trial and were rejected by the Court at that time.  And the constitutional attacks on 18 U.S.C. § 2339 were exhaustively briefed and decided by this Court before the trial in this matter.  Accordingly, Sabir's motions cover no new ground, but simply retrace issues the Court has already resolved.

Accordingly, considering all of the relevant circumstances, including the lack of good cause, the Court in its discretion should not consider on the merits Sabir's motions for a new trial or a judgment of acquittal.

## POINT II

### Sabir Should Not Be Granted A New Trial

**A.  Applicable Standards Under Rule 33**

Rule 33 provides that the court "may grant a new trial to [a] defendant if the interests of justice so require."  Fed. R. Crim. P. 33.  Although "the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," that discretion should be exercised "'sparingly'" and only in "'the most extraordinary circumstances.'"  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir.

2001) (quoting <u>United States</u> v. <u>Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992)), <u>pet. for</u>

<u>rehearing filed</u>, No. 99-1262(L) (May 11, 2001).  "The ultimate test on a Rule 33 motion

is whether letting a guilty verdict stand would be a manifest injustice."  <u>Ferguson</u>, 246

F.3d at 134 (citing <u>Sanchez</u>, 969 F.2d at 1414).  As the Second Circuit has explained:

> In making this assessment, the judge must examine the totality
> of the case.  All of the facts and circumstances must be taken
> into account.  An objective evaluation is required.  There must
> be a real concern that an innocent person may have been
> convicted.  It is only when it appears that an injustice has been
> done that there is a need for a new trial "in the interest of
> justice."

<u>Sanchez</u>, 969 F.2d at 1414 (footnote omitted).

**B.    Discussion**

**1.    The Court's Removal Of Juror #10 And Decision To Continue With Eleven Jurors Was Not Error And Does Not Warrant A New Trial**

Sabir argues that he should be granted a new trial because the Court erred in

deciding to proceed with eleven jurors, claiming that instead of doing so, the Court should

have added the first alternate juror to the panel.  Sabir is wrong.

**a.    Relevant Facts**

Following the Court's legal instructions, the jury retired to deliberate on

May 17, 2007.  That same day, the Court was reminded by Juror #10 that she had pre-

existing plans to attend a family reunion the following day, May 18, 2007, and would not

be available to deliberate at all on that day.  (Tr. 2552).  The Court solicited the parties'

views, noting that the Court had planned to ask the jurors whether they wished to

4

deliberate on Friday, May 18, 2007, given that the trial had already taken longer than expected and that to send the jurors home on Thursday afternoon without having the opportunity to continue until the following Monday might put undue pressure on the jury to reach a hasty verdict.  The defendant objected to the replacement of Juror #10 for her failure to be present for deliberations on May 18, instead requesting that the jury be excused on Thursday May 17, 2007 and, assuming no verdict, to return the following Monday to continue their deliberations.  (Tr. 2553).  Ultimately, before the Court had the opportunity to ascertain from the jurors whether they wished to deliberate on May 18, Juror #10 agreed to stay that day and continue her participation.  (Tr. 2558).

The following morning, during the course of the jury's deliberations, the Court received a note from Juror #10, who indicated, notwithstanding her prior agreement to continue to deliberate through May 18 and, if necessary, May 21, that she wished to leave immediately and would not return until May 22, 2007.  (Tr. 2658-59).  At this point, both parties agreed that Juror #10 should be dismissed.  (Tr. 2659).  While the Government suggested proceeding with eleven jurors, the defendant instead proposed to replace Juror #10 with the first alternate juror.  (Tr. 2659-60).

Given Juror #10's stated refusal to stay to deliberate on May 18 and to return for continued deliberations on May 21, the Court found that it had good cause to dismiss her.  After hearing argument from the parties, the Court – aware that if the alternate juror were empaneled the Court would be obligated to instruct the jury to start

5

their deliberations over on May 21 – then decided to proceed with eleven jurors as permitted by Federal Rule 23, so as not to lose the day-and-a-half the jury would have been deliberating by the time an alternate could have been called back.  In so doing, the Court noted that the jurors had been told at the outset that the case would take approximately three weeks, and that proceedings were at that time at the end of the fourth week.  (Tr. 2663).  The Court also expressed concern that other jurors may have increasingly pressing problems with their employers as time went on, and that these time pressures could result in a hurried verdict.  (Tr. 2663-64).

> **b.    Applicable Law**

Rule 23(b)(3) of the Federal Rules of Criminal Procedure provides that "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." Fed. R. Crim. P. 23(b)(3). The Rule affords district courts "wide latitude" in exercising their discretion to discharge jurors and proceed with eleven-member juries. United States v. Paulino, 445 F.3d 211, 226 (2d Cir. 2006) (quoting United States v. Gibson, 135 F.3d 257, 259 (2d Cir. 1998)); see also United States v. Baker, 262 F.3d 124, 129-130 (2d Cir. 2001); United States v. Reese, 33 F.3d 166, 173 (2d Cir. 1994); United States v. Ruggiero, 928 F.2d 1289, 1300 (2d Cir. 1991).

"The 'just cause' phrase is not so restricted; it embraces all kinds of problems-temporary as well as those of long duration—that may befall a juror during jury

deliberations." <u>Reese</u>, 33 F.3d at 173; <u>see</u> <u>United States</u> v. <u>Stratton</u>, 779 F.2d 820, 832 (2d

Cir. 1985) ("We read the 'just cause' standard more broadly to encompass a variety of

temporary problems that may arise during jury deliberations, confronting the trial judge

with the need to exercise sound discretion as to the procedure to be followed at a

particularly sensitive stage of the trial."). "All that is needed to satisfy a prudent exercise

of discretion is to be certain the trial court had sufficient information to make an informed

decision." <u>Reese</u>, 33 F.3d at 173; <u>see also</u> <u>United States</u> v. <u>Paulino</u>, 445 F.3d at 226.[1]

### c.    Discussion

Defendant Sabir did not object at trial, and does not assert now, that it was

error for the Court to excuse Juror #10.  The defendant claims, however, that Juror #10

should have been replaced with an alternate juror instead of proceeding with eleven

jurors.

The Court's decision to proceed with eleven jurors was well within its

considerable discretion and was entirely reasonable given the circumstances.  First, as

both parties agreed, there can be no question that the Court had good cause to excuse

Juror #10, who essentially declared herself unwilling to stay to continue deliberations.

And the defendant does not dispute the choices that were available at that time (mid-day

on May 18, 2007): either the jury could continue deliberating as eleven jurors once Juror

---

[1]  On appeal, a trial court's decision to dismiss a juror under Rule 23(b) and permit
deliberations to proceed with 11 jurors is reviewed solely for abuse of discretion. <u>See</u> <u>id</u>.
at 225; <u>United States</u> v. <u>Ruggiero</u>, 928 F.2d 1289, 1300 (2d Cir. 1991).

#10 was dismissed, or the first alternate juror would have to be contacted and brought back to rejoin the jury, which certainly would not have been accomplished before May 21, and the newly-constituted jury would be instructed to begin anew with their deliberations at that time.[2]

Moreover, as the Court was well aware, by the time of Juror #10's dismissal, the trial already had exceeded substantially its expected length; jurors were starting to have issues with their employers in which the Court was having to intervene; and to bring back the first alternate juror would have required the jury to start its deliberations over again.  Given these issues, the Court acted well within its discretion and had ample cause to dismiss Juror #10 and proceed with a jury of eleven members.[3]

2.     **The Actions Of A Juror Who Conducted Limited Research Do Not Warrant A New Trial**

Sabir argues that a new trial should be ordered because he alleges that the jury was exposed to extraneous evidence during the course of its deliberations.

_____

[2]  While at the time, defense counsel asserted that he believed that the jury would have to be instructed to begin their deliberations anew upon the dismissal of Juror #10 even if she were not replaced (Tr. 2667-69), that position has no basis in law and the defendant does not renew that claim in this motion.

[3]  Nor is there any basis or support for Sabir's implication that the Court should have decided to replace Juror #10 with the first alternate juror because both were African-American.  In essence, Sabir appears to be saying that, even if it were perfectly acceptable to proceed with eleven jurors, the Court should not have done so because of the race of the first alternate.  This suggestion, entirely unsupported by any legal authority, would turns Batson v. Kentucky, 476 U.S. 79 (1986), on its head by actually encouraging race-conscious Court rulings.

Specifically, Sabir suggests that limited internet research on Sabir's co-conspirator, Tarik Shah, that was conducted by Juror #8 during the course of the trial was prejudicial to Sabir. Sabir should not be granted a new trial, because the information learned by Juror #8 is not information that would influence a reasonable juror in his or her deliberations.

### a.     Relevant Facts

On May 21, 2007, the third day of deliberations, the jury sent out a note stating that it had come out during deliberations that Shah pleaded guilty. At the same time, another note was received by the Court that stated, among other things, that Juror #8 had said she saw or did research on Shah. (Tr. 2681-82). The defendant immediately moved for a mistrial. (Tr. 2682). In response to the Government's argument that the defendant cannot have been prejudiced by the information that Shah had pleaded guilty because that was not inconsistent with the defendant's litigation strategy, the defendant stated that there had been "absolutely no indication whatsoever from the defense as to any outcome of the judicial proceedings against Tarik Shah." (Tr. 2687).

The Court indicated its intention to question Juror #8 about what research, if any, she may have done. Following the parties' agreement to proceed in this manner with respect to Juror #8, Juror #8 was called into the robing room with the parties present and asked whether she had seen or done any research on Tarik Shah. Juror #8 stated that it was "[n]ot research, but I was curious as to why Mr. Shah was not here, and what happened to him . . . So I Googled Tarik Shah." (Tr. 2694). When asked the results of

her search, Juror #8 stated that "I found that Tarik Shah pled guilty to something."  When the Court asked whether there was anything else that Juror #8 had learned, she responded in the negative.  Juror #8 was then instructed that the verdict as to defendant Sabir was to be based solely on the evidence put forth in the courtroom, and was asked whether she was able to follow that instruction.  Juror #8 responded "Definitely."  And when asked whether anything about the information she had seen on the internet would keep her from being fair and impartial, Juror #8 said "no."  (Tr. 2694).

The Court granted defense counsel's request to ask a follow-up question to ascertain whether the information learned by Juror #8 had been shared with other jurors; in response to the question, Juror #8 stated that "[a] few people heard it."  (Tr. 2696). Defense counsel then requested that Juror #8 be asked who had heard it.  The Court declined this request as overly intrusive into the deliberative process, and reiterated that it planned to instruct the entire jury about their obligations to decide the case based solely on the evidence admitted at trial and to inquire whether any juror would be unable to do so.  (Tr. 2697).  The Court also declined defense counsel's request to ask Juror #8 whether she had Googled Sabir's name, noting that there was no cause to make that inquiry.  (Tr. 2697).

As the parties had agreed, the jury was then instructed in pertinent part that:

It is your function in this case to decide the issues of fact.
Your decision on the issues of fact is to be based solely on the
evidence.  Nothing I say is evidence.  Nothing any of the
lawyers say is evidence.  Questions by themselves are not

10

evidence.  Objections are not evidence.  Testimony that has
been excluded or which you're told to disregard is not
evidence.  The evidence consists of the sworn testimony of
the witnesses and the exhibits that have been received into
evidence for your consideration.  Also, in some instances
there were facts the lawyers agreed to or facts that I instructed
you to find. . . . You may not draw any inference, favorable or
unfavorable, toward the government or the defendant from the
fact that any person in addition to the defendant is not on trial
here.  You also may not speculate as to the reasons why other
persons are not on trial.  Those matters are wholly outside
your concern and have no bearing on your function as jurors. .
. . Now, ladies and gentlemen, is there any juror who is unable
or unwilling to follow those instructions?  Anyone?

(Tr. 2699-2700).  Following this instruction and inquiry, the jury returned to its

deliberations.  Later that day, the jury delivered its verdict.

### b.    Applicable Law

While extra-record information that comes to the attention of a juror is

"presumptively prejudicial," United States v. Greer, 285 F.3d 158, 173 (2d Cir. 2002)

(quoting Remmer v. United States, 347 U.S. 227, 229 (1954)), this presumption may be

rebutted by a "showing that the extra-record information was harmless," Bibbins v.

Dalsheim, 21 F.3d 13, 16 (2d Cir. 1994).  This Court has repeatedly stated that "'[t]he

touchstone of [a] decision . . . is thus not the mere fact of infiltration of some molecules

of extra-record matter . . . but the nature of what has been infiltrated and the probability of

prejudice."  Id. At 16 (quoting United States ex rel. Owen v. McMann, 435 F.2d 813, 818

(2d Cir. 1970)).

"A trial court's post-verdict determination of extra-record prejudice must be

11

an objective one, focusing on the information's probable effect on a hypothetical average juror." Greer, 285 F.3d at 173 (internal quotations omitted). If a "hypothetical average juror" would not have been influenced by the extrinsic information learned by the jury, a new trial motion based on the jury's access to that information must be denied. Id. at 174.

In reviewing extra-record information, "[t]he trial court should assess the 'possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." United States v. Weiss, 752 F.2d at 783. "The Court may properly conclude that such extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to this matter exists." Id.; see also United States v. Burket, 480 F.2d 568, 571 (2d Cir. 1973) ("Since nothing was added to the evidence" against defendant by the improperly submitted document "its presence in the jury room could hardly have had any prejudicial impact").

Additionally, a district court has "broad discretion in reviewing the issue of the prejudicial effect of the infiltration of extra-record evidence into the deliberations of the jury." Weiss, 752 F.2d at 783 (citations omitted).[4]

c.    **Discussion**

In the present case, Sabir alleges that Juror #8's internet search and resulting

---

[4] The district court's handling of alleged juror misconduct or bias is reviewable only for abuse of discretion. Weiss, 752 F.2d at 783.

report to at least some of her fellow jurors that Shah had pleaded guilty to something

necessitates a new trial.  Sabir is incorrect, and his new trial motion on this basis should

be denied.[5]

         The information at issue here – that Sabir's co-conspirator Tarik Shah

pleaded guilty to "something" – simply would not have influenced the hypothetical

average juror in a way that is prejudicial to Sabir.  In the first place, coming right on the

heels of the extraneous information that certain members of the jury apparently heard

were the Court's significant efforts to get to the bottom of what happened and to ensure

the continued integrity of deliberations.  In this case, unlike in most of the cases cited by

the defendant in which the district court received only a post-trial allegation of the

injection of extraneous information, the Court and the parties had the benefit of learning

about what Juror #8 had done during deliberations, permitting the Court to make an

inquiry that properly explored what information had been imparted and to instruct the jury

_____

     [5] To the extent Sabir suggests holding a post-trial hearing to delve into which
jurors heard what, such a hearing would be contrary to caselaw and, in any case,
ineffectual.  The law is clear that the Court would not be permitted to inquire into the
effect of learning of Shah's guilty plea upon their deliberations, see Greer, 285 F.3d at
173 (quoting United States v. Calbas, 821 F.2d 887, 897 (2d Cir. 1987)), and the parties
and the Court already know, from the examination of Juror #8 and the instructions given
to her and the rest of the jury, everything that under the law they are entitled to know:
namely, the "extraneous" information that was put before the jury.  Accordingly, holding
a post-trial hearing would be pointless, as its only purpose would be the improper one of
scrutinizing the deliberations of the jury.  See United States v. Ianiello, 866 F.2d 540, 543
(2d Cir. 1989) (observing that such post-verdict hearings "should be avoided whenever
possible.").

again about its duty to decide the case based only on the evidence, while protecting the jury's deliberative process.

The steps taken by the Court to (1) learn exactly what information had been imparted; (2) ensure that Juror #8 could follow the Court's instructions to decide the case based only on the evidence from the trial and that persons not on trial were not at issue and could not play any role in her deliberations; and (3) ensure that the rest of the jury, including all of those who may have heard the information found by Juror #8, could also follow these instructions, more than cured any potential prejudice that could have attached from the jury's learning that information.  Without question, a hypothetical juror would reasonably be assumed to follow these instructions and continue his or her fair deliberations.[6]

At the end of the day, Sabir's argument fails not only because of the Court's prompt and effective responses in dealing with Juror #8's actions, but also because the information obtained by the jury cannot have harmed Sabir or affected a hypothetical juror's view of Sabir, given Sabir's defense strategy.  A large part of Sabir's defense strategy, given the overwhelming evidence of Shah's views and intentions that was introduced into evidence, was to distance himself from Shah and to argue to the jury that he believed and acted differently from Shah.  For example, during his closing argument,

---

[6] As has been long established in this Circuit, jurors are presumed to follow the Court's instructions to them.  See, e.g., Britt v. Garcia, 457 F.3d 264, 272 (2d Cir. 2006).

Mr. Wilford went through the testimony of nearly every witness, explaining that while many of them provided detailed testimony about Shah, they did not say much about Sabir. (Tr. 2400-06).  Mr. Wilford then argued that:

> This case – if this was a case about Tarik Shah, I wouldn't even have got up.  Tarik Shah is guilty.  But this case is not about Tarik Shah.  It is about Dr. Sabir.  It is about the relationship between Dr. Sabir and Tarik Shah. The Government would have you believe that there is no separation; that Tarik Shah is Dr. Sabir. . . . But you can't do that.  You have to look at the evidence.  You have to look at the evidence and understand that whatever Tarik Shah is, whatever Tarik Shah did, Dr. Sabir is a separate entity; a separate entity who has to be judged by you based on the evidence the government introduced against him, not against Tarik Shah.

(Tr. 2406-07) (emphasis added).

This strategy did not appear for the first time at closing arguments.  During the cross-examination of virtually every Government witness who testified about Tarik Shah, Mr. Wilford emphasized with his questions the differences between Shah and Sabir.  See, e.g., Tr. 321-22 (eliciting from James Wajid that Sabir was not present for Shah's conversations about jihad); Tr. 521-23 (eliciting from Samuel Nelson that he was asked to look for martial arts training locations by Shah, but not Sabir); Tr. 212 (eliciting from Anwar Kearney that when Tarik Shah was causing trouble at the mosque, Sabir was not present).  And during Sabir's own testimony, Sabir repeatedly emphasized the differences between himself and Shah, stating that he never talked to Shah about al Qaeda, or about meeting an al Qaeda recruiter, or about providing support to al Qaeda (Tr. 1618, 1639), that he didn't even understand the bulk of the conversation between

15

Shah and Ali, the undercover (Tr. 1483), and agreeing with his lawyer's depiction of

Shah as a "greedy, despicable man" (Tr. 1673).

Given this posture by the defense, it cannot have harmed Sabir that a juror

or jurors learned that Shah may have pleaded guilty to something, because Sabir's very

defense included as a major component that, indeed, Shah was guilty, see Tr. at 2406

("Tarik Shah is guilty"), but that Sabir was a different person in a different position and

must be evaluated as such.

Moreover, given the overwhelming volume of recorded evidence in which

Shah explains at great length what it is that he wished and planned to do to assist al Qaeda

in its terrorist mission, it cannot be seriously argued that the news that Shah may have

pleaded guilty to something would have had any impact on a reasonable juror's view of

Shah, much less that this fact would have impacted a juror's view of Sabir.  Finally, the

strength of the evidence against Sabir, see generally Point IV, infra, further supports the

Court's conclusion that it was proper to not excuse Juror #8 and continue to verdict in this

case.

### POINT III

### Section 2339B is Constitutional As Applied to Sabir

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, the Court

on the defendant's motion must enter a judgment of acquittal "of any offense for which

the evidence is insufficient to sustain a conviction."  In Point II of his motion for a new

trial, Sabir contends that his convictions under 18 U.S.C. § 2339B must be set aside

because his "actions were unconstitutionally criminalized by this statute."  (Sabir Br. at

16).  Sabir argues that "the constitutionality of the statutes he was convicted under, as

applied to his conduct upon the evidence adduced at trial is sorely insufficient."  (Sabir

Br. at 17).  In particular, Sabir argues that § 2339B is void for vagueness (Sabir Br. at 17)

and overbroad (Sabir Br. at 19), primarily because Sabir's provision of medical assistance

could not be understood to fall within the prohibitions of the statute.

Sabir's argument is precluded by the law of the case doctrine, and fails on

the merits.  Well before trial, then-defendant Tarik Shah submitted a voluminous motion

attacking the constitutionality of the material support statute on both vagueness and

overbreadth grounds, precisely the issues that Sabir raises now.  Sabir filed his own

similar motions, and joined in those filed by Shah.  The Government responded with a

detailed analysis of the various prongs of "material support or resources" at issue in this

case — "training," "expert advice or assistance," and "personnel" — explaining how each

term provided an individual of ordinary intelligence with ample notice of the conduct

prohibited by the statute, and how the definitions were sufficiently precise to allay any

concerns about selective enforcement.  (*See* Gov't Mem. of Law in Opp'n to Defendants'

Pretrial Motions, Sept. 12, 2006, at 17-41).  The Court held oral argument on those

motions on October 30, 2006, and January 17, 2007, then denied the motions in their

entirety.  Specifically as to Sabir, the Court rejected his claims that the statute was

unconstitutionally vague, finding that the definition of "expert advice or assistance" is "certainly clear enough, and any reasonable person would understand it to include the provision of medical services." (1/17/07 Tr. at 34-35). The Court also held that Sabir was not exempt from the reach of the material support statutes merely because he is a medical doctor, noting that offering one's services proactively to aid jihadists who may become wounded during terrorist operations or training is a far cry from merely operating a clinic that will treat anyone needing aid. (1/17/07 Tr. at 35-36).

The Court subsequently issued an Opinion and Order expanding upon its reasoning. *See United States* v. *Shah*, 474 F. Supp. 2d 492 (S.D.N.Y. 2007). In that opinion, the Court discussed the standards applicable to vagueness challenges, rejected Sabir's claim that the statutory exception for "medicine" encompassed the charged conduct, and found that "any reasonable doctor would be on notice from the plain language of the statute that conspiring to provide, or providing or attempting to provide, 'medical support to wounded jihadists' under the direction and control of al Qaeda, knowing that al Qaeda engages in terrorism or terrorist activity, would constitute the provision of 'expert advice or assistance.'" *Id.* at 497.

The "law of the case" doctrine provides that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case," absent an intervening ruling from a higher court or change in the applicable law. *United States* v. *Uccio*, 940 F.2d 753, 758 (2d Cir. 1991); *see also*

*Arizona* v. *California*, 460 U.S. 605, 618 (1983); *United States* v. *Crowley*, 318 F.3d 401, 420 (2d Cir. 2003); *Aramony* v. *United Way of America*, 254 F.3d 403, 410 (2001).  This principle is a prudential doctrine, not a jurisdictional limitation on a court's power, and a court may, in its discretion, decide to revisit a previously-determined issue if doing so will not unduly prejudice the party otherwise protected by the previous ruling.  *See Uccio*, 940 F.2d at 758.

Sabir offers no reason for this Court to revisit its previous decision; indeed, he does not even acknowledge the existence of the prior ruling.  This Court carefully considered the arguments of the parties, which were set out in extensive, thorough briefs, and heard oral argument on two separate occasions before ruling.  The facts proven at trial matched the allegations set forth in the indictment and relied upon by the Court in its earlier ruling.  The Court's January 2007 decision definitively resolved this issues, and should not be revisited.

Should the Court decide to return to the merits of Sabir's arguments, the Government respectfully requests leave to rely on its previous submission of September 12, 2006, which catalogued the applicable law and addressed Sabir's arguments in detail.  The Government is unaware of any material change in the applicable law since the submission of that brief.[7]

---

[7] Since the earlier briefing, one additional district court has ruled, consistent with this Court's holding, that § 2339B is not unconstitutionally vague.  *See United States* v. *Abdi*, 2007 WL 2153234 (S.D. Ohio July 26, 2007).

19

## POINT IV

### The Evidence Proved Sabir's Guilt on Both Charges

Finally, in Point III, Sabir argues that the evidence admitted at trial was insufficient to support the jury's guilty verdict on both counts and therefore moves for a judgment of acquittal.  Sabir made an identical motion at the close of the evidence, which this Court denied.  (Tr. at 2543-44).  His renewed motion, assuming that it too is not barred by the law of the case doctrine, should likewise be rejected.

The recorded conversations and other evidence admitted at trial established all of the elements of a conspiracy to provide material support to al Qaeda and of an attempt to do so.  Tarik Shah's statements on tape, first to the confidential informant, and later to the FBI undercover agent, proved the existence of a conspiracy with Rafiq Sabir going back to at least early 2004.  In January 2004, when Saeed, the confidential informant, first raised with Shah the prospect of introducing Shah to individuals with terrorist connections looking for people with "special skills," Shah immediately says that his close friend of twenty years, a doctor, would come with him as a "package."  (GX 807T at 4).  In March, when Shah first met Ali, the undercover agent posing as an al Qaeda recruiter, he again could wait to offer up Sabir as a fellow believer who would be willing to help the cause.  (GX 902T at 2-9, 23-25).  These conversations reveal that Shah and Sabir had long discussed and agreed that they wished to support a jihad like the one being waged by al Qaeda, and now were being given the chance to do so.  After Shah and Ali met in

Plattsburgh in March, Sabir came to New York and stayed at Shah's house.  (GX 814T).

Thereafter, Shah agreed to set up a meeting involving Sabir in April, which Sabir

ultimately did not attend because of his family trip to Jamaica.  Had that face-to-face

discussion between Shah and Sabir resulted in anything less than a willingness by Sabir to

meet with Ali and go forward with their plan to help al Qaeda, Shah would not have even

bothered to try to set up that April meeting.  Given the evidence of the closeness between

Shah and Sabir, the jury was entitled to conclude that Shah and Sabir discussed Shah's

meeting with Ali during that time frame.

Sabir's conduct during the May 20, 2005, meeting with Shah and Ali also

demonstrates his participation in the conspiracy with Shah.  Sabir expressed no surprise

or confusion at the topics discussed, which included jihad, recruiting, organizational

control, and the need for doctors to aid the wounded.  (GX 906T).

To prove Sabir guilty on Count One, the Government was required to prove the

existence of a conspiracy to provide material support or resources to al Qaeda, and Sabir's

membership and participation in that conspiracy.  The evidence proved a conspiracy

between Shah and Sabir to provide training, expert advice or assistance, and personnel, as

those terms are defined in the statute, in the forms of Shah's martial arts expertise and

Sabir's medical services.  The Government also proved that it was, in fact, al Qaeda that

he and Shah agreed to help.  Ali's discussions with Shah in March and April 2004, and

the conversation between Shah, Sabir, and Ali on May 20, 2005, leave no doubt that the

subject at hand is al Qaeda.  And the Government proved that Sabir was well aware that al Qaeda has engaged in terrorist activity; Sabir admitted as much in his testimony.

As to Count Two, the Government was required to prove that Sabir attempted to provide material support or resources to al Qaeda, or, in other words, that Sabir took a "substantial step" towards providing that support.  In the May 20, 2005, meeting between Shah, Sabir, and Ali, Sabir boasted of his freedom of movement within Saudi Arabia, his intention to purchase a minivan when he returned to that country in a few days, and his desire to meet the mujahideen.  (GX 906T).  Then, Sabir gave Ali a small piece of paper with Sabir's telephone numbers (written in code) on it.  (GX 401).  By giving Ali that information, Sabir was doing more than expressing a willingness to help al Qaeda; he was actually trying to help al Qaeda, by making himself available to the terrorist cells operating in Saudi Arabia.  Sabir's availability and desire to help would have been of great value to al Qaeda, and easily constituted a substantial step toward providing that support.

The evidence also supports Sabir's conviction on Count Two under an aiding and abetting theory, in that Sabir helped Shah try to give combat training to jihadists.  Shah was looking for a new location in which to conduct his martial arts training, and Shah and Saeed went so far as to scout out a potential location — one that had been secretly offered by the FBI.  (GX 804T - 807T).  Sabir was going to help Shah pay for that training location once Shah found it.  (Tr. 516-17).  In that respect, Sabir was also guilty of Count

Two based on an aiding and abetting theory.

In sum, the evidence more than sufficiently supported the jury's guilty verdicts on both Count One and Count Two of the superseding indictment, and Sabir's motion to set aside those verdicts should be denied.

## CONCLUSION

For the reasons set forth above, defendant Sabir's motions should be denied.

Dated:       September 11, 2007
             New York, New York

                              Respectfully submitted,

                              MICHAEL J. GARCIA
                              United States Attorney


                    By:_____/s/ Jennifer G. Rodgers_____
                              KARL METZNER
                              JENNIFER G. RODGERS
                              Assistant United States Attorneys
                              (212) 637-2476/2513

23