UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

            -v.-                                   :

RAFIQ SABIR,                                :          S4 05 Cr. 673 (LAP)
      a/k/a "The Doctor,"

                                 :

          Defendant.

                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## SENTENCING MEMORANDUM


                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States
                                  of America


JENNIFER G. RODGERS
KARL METZNER
Assistant United States Attorneys,
      Of Counsel.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA               :

          -v.-                         :

RAFIQ SABIR,                           :          S4 05 Cr. 673 (LAP)
     a/k/a "The Doctor,"
                                       :

               Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM

The Government respectfully submits this Sentencing Memorandum to set forth its

view of the appropriate sentence to be imposed on defendant Rafiq Sabir, who is

currently scheduled to be sentenced on Thursday, November 29, 2007, at 3:00 p.m.   As

determined by the Probation Office in its Presentence Investigation Report ("PSR"),

Sabir's sentencing range under the United States Sentencing Guidelines is 360 months to

life, following his conviction at trial on Counts One and Two of Indictment S4 05 Cr. 673

(LAP) (the "Indictment").  The statutory maximum period of incarceration is 360 months.

For the reasons that follow, Sabir should receive a sentence substantially greater than the

180 month sentences imposed on his codefendants Tarik Shah and Mahmud Brent, each

of whom pled guilty, acknowledged their conduct, accepted responsibility for that

conduct, did not perjure themselves in an effort to evade conviction, and agreed to waive

any appeals or other challenges to their convictions or sentences, thereby allowing the

Government to allocate its investigative and prosecutorial resources elsewhere.

Sabir's claims regarding the calculation of the applicable Sentencing Guidelines

range and his interpretation of the sentencing factors of 18 U.S.C. § 3553(a) do not

warrant a lower sentence.  The Probation Office's Presentence Investigation Report

("PSR") properly calculated Sabir's Guidelines (except for its omission of an

enhancement for obstruction of justice), and an appropriate analysis of the relevant

sentencing factors supports the Government's position that Sabir's crimes warrant

substantial punishment.

## I.      Sabir's Offense Conduct

Rafiq Sabir was convicted of conspiring with his lifelong friend, Tarik Shah, to

provide material support or resources to the al Qaeda foreign terrorist organization, and of

attempting to provide that support.  The evidence at trial, which is detailed in paragraphs

10 through 71 of the PSR, demonstrated that Sabir, a doctor, agreed to assist al Qaeda

fighters in Saudi Arabia by using his medical training and expertise to treat any injuries

those terrorists might sustain, either in training or during terrorist operations.  Shah had

met with "Ali," a person Shah believed to be an al Qaeda recruiter, talked with the

recruiter (in reality FBI Special Agent Ali Soufan acting undercover) about the desire

both Shah and Sabir had to join the jihad, and then discussed that prospect with Sabir.

Then, on May 20, 2005, Shah and Sabir met with "Ali" together.  During that meeting,

Shah, Sabir, and "Ali" discussed jihad, training camps, and what Shah and Sabir could do to further the cause of al Qaeda.  When "Ali" told Shah and Sabir that he was authorized to give *bayat* – the oath of allegiance to Usama bin Laden – Shah and Sabir agreed to take part in that ceremony with "Ali."  On that day, Shah and Sabir then each swore themselves to al Qaeda and bin Laden, committing themselves to the path of holy war.

Sabir not only agreed to help al Qaeda, but he attempted to do so as well.  During the May 20 meeting, Sabir advised "Ali" of his upcoming work assignment in Saudi Arabia, and emphasized his intention to buy a car and his ability to use his military identification to move freely around the country.  Sabir complained that the housing quarters he had previously been assigned in Riyadh did not afford enough privacy to allow visitors to come and go unnoticed.  And Sabir, believing that "Ali" was an al Qaeda member, wrote his telephone numbers in code and gave them to "Ali," with the understanding that "Ali" would pass them on to the mujahideen fighters in Saudi Arabia, whom Sabir said he would like to meet.  By providing that contact information and emphasizing his availability, Sabir took a substantial step toward providing expert advice and assistance — i.e., his medical skills — to al Qaeda.  Sabir also attempted to help al Qaeda by assisting Shah's efforts to procure a training facility for Shah to use to give martial arts training to potential jihadists.

Substantial evidence introduced at trial proved Sabir's intent to embrace terrorism in pursuit of his extreme, fundamentalist view of Islam.  In 1998, Sabir and Shah had

discussed the possibility of moving to Afghanistan, then under the control of the

repressive Taliban regime, because it represented to them a pure form of the Islam that

they believed in.  Several witnesses testified to the martial arts training conducted by

Shah, which Sabir attended.  Those classes included training in offensive, military-style

tactics using knives and sticks.  And in conjunction with those classes, Shah and Sabir

declaimed on the obligation of all Muslims to prepare for jihad.  Sabir's understanding

that "jihad" meant armed struggle was proven by the introduction of numerous books

Sabir kept in his home in Saudi Arabia.  Sabir had highlighted several passages of these

texts on Islamic fundamentalism, passages that revealed Sabir's belief that jihad is an

armed struggle, that nonbelievers must be forcibly expelled from the Arabian Peninsula,

and that it was a true Muslim's duty to engage in jihad if given the opportunity.

## II.       Sentencing Law And Procedure

Nearly three years after the Supreme Court's decision in *United States* v. *Booker*,

453 U.S. 220 (2005), the Court is by now quite familiar with the law and procedures

applicable to criminal sentencings.  Although the Sentencing Guidelines are now advisory

rather than mandatory, they nevertheless continue to play a critical role in trying to

achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform

Act, namely, "ensuring similar sentences for those who have committed similar crimes in

similar ways."  *Id.* at 252.  In furtherance of that goal, judges are required to "consider the

Guidelines 'sentencing range established for . . . the applicable category of offense

committed by the applicable category of defendant,' § 3553(a)(4), the pertinent

Sentencing Commission policy statements, the need to avoid unwarranted sentencing

disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) (main

ed. and Supp. 2004)." *Id.* at 260.

In sentencing defendants, district courts must consider the factors set forth in 18

U.S.C. § 3553(a).  This provision provides that the sentencing "court shall impose a

sentence sufficient but not greater than necessary, to comply with the purposes set forth in

paragraph (2) of this subsection," and then sets forth seven specific considerations:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2)  the need for the sentence imposed—
>   (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B)  to afford adequate deterrence to criminal conduct;
>   (C)  to protect the public from further crimes of the defendant;
>   (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effect manner;
> (3)  the kinds of sentences available;
> (4)  the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];
> (5)  any pertinent policy statement [issued by the Sentencing Commission];
> (6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7)  the need to provide restitution to any victims of the offense.

5

In *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), the Second Circuit explained that district courts should engage in a three-step sentencing procedure in light of *Booker*.  First, the court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."  *United States* v. *Crosby*, 397 F.3d at 112.  Second, the court should consider whether a departure from that Guidelines range is appropriate.  *Crosby*, 397 F.3d at 112.  Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)" and determine the sentence to impose.  *Id.* at 113.  A failure to consider the Guidelines range and to instead simply select a sentence without such consideration is error.  *Id.* at 115.

## III.    Sabir's Sentencing Guidelines Range Is 360 Months

The Probation Office determined that Sabir's sentencing range under the Guidelines is restricted to 360 months, due to the statutory maximum sentences applicable to the counts of conviction.  (PSR ¶ 129).  Sabir objects to the Probation Office's Guidelines calculations in two respect.  First, Sabir contends that the two-level enhancement from § 2M5.3 should not apply.  (Wilford Ltr. at 7).  Second, Sabir argues that the operation of § 3A1.4, which adds 12 levels to the Offense Level and assigns the defendant a Criminal History Category of VI, "is in effect a form of double counting that

is impermissible and should not be used in calculating Dr. Sabir's Criminal History

Category." (Wilford Ltr. at 7). Both objections should be overruled.

### A. The Enhancement From § 2M5.3 Properly Applies

Section 2M5.3 provides a base offense level of 26 for violations of Section 2339B

of Title 18. U.S.S.G. § 2M5.3(a). The guideline then directs courts to add two levels

"[i]f the offense involved the provision of . . . funds or other material support or resources

with the intent, knowledge, or reason to believe they are to be used to commit or assist in

the commission of a violent act." *Id.* § 2M5.3(b)(1)(E). Sabir's offenses fall within this

definition.

Sabir was convicted of conspiring with Shah to provide two different kinds of

support to al Qaeda: Shah, the martial arts expert, was to provide training in deadly hand-

to-hand combat for jihadist fighters, skills they could put to use in terrorist operations.

Sabir was to use his medical training to treat the wounds of those fighters, enabling them

to return to the "fight" and emboldening their leaders to take greater risks, knowing that

medical care would be available if injuries occurred. Sabir was also convicted of

attempting to provide his medical service to al Qaeda terrorists operating in Saudi Arabia.

As a result, the offenses of conviction "involved" the provision of material support or

resources by Sabir with at least the "reason to believe" that they would be used by al

Qaeda to "assist in the commission of a violent act." Sabir need not have himself

engaged in an act of violence to be subject to the enhancement; he need only have acted

in support of such violence.  *See United States* v. *Aref*, No. 04-CR-402, 2007 WL 804814, at *1 (N.D.N.Y. Mar. 14, 2007) (applying two-level upward adjustment of § 2M5.3(b)(1)(E) where defendant laundered funds from CW's purported importation of surface-to-air missile ("SAM") "with the intent, knowledge, and belief that the SAM would be used in an attack on the Pakistani Ambassador in New York City").  The objects of Sabir's conspiracy with Shah, and Sabir's attempt to put that agreement into action, satisfy the requirements for the enhancement.

### B.      There Is No Impermissible Double-Counting

Sabir argues that the operation of § 3A1.4(b) "is in effect a form of double counting that is impermissible and should not be used."  (Wilford Ltr. at 7).  But where the guidelines specifically direct that both a horizontal and vertical adjustment applies to the defendant, no impermissible double counting occurs.

Section 3A1.4 provides that, when a defendant is convicted of a "federal crime of terrorism," the base offense level is increased by 12 levels and must be at least 32. U.S.S.G. § 3A1.4(a).  The guideline also provides that "[i]n each such case, the defendant's criminal history category . . . shall be Category VI."  *Id.* § 3A1.4(b).  Thus, the Sentencing Commission has determined that a defendant convicted of a terrorism offense merits both an increased offense level, to reflect the seriousness of the offense, and an increased Criminal History Category, to reflect the danger that the defendant poses to society.  "[T]he offense level and criminal history category measure different things.

The offense level represents a judgment as to the wrongfulness of the particular act.  The criminal history category principally estimates the likelihood of recidivism." *United States* v. *Pereira*, 465 F.3d 515, 522 (2d Cir. 2006) (quotation omitted).  Such deliberate calculations do not constitute impermissible double-counting, because they are specifically intended by the Guidelines.  *See United States* v. *Maloney*, 406 F.3d 149, 153 (2d Cir. 2005) ("Moreover, we have consistently held that double counting is permissible in calculating a Guidelines sentence where, as here, each of the multiple Guidelines sections applicable to a single act serves a distinct purpose or represents a discrete harm."); *see also United States* v. *Hammoud*, 381 F.3d 316, 356 (4th Cir. 2004) (en banc) (no improper double-counting from application of both § 2M5.3 and § 3A1.4), *vacated*, 543 U.S. 1097 (2005), *reinstated*, 405 F.3d 1034 (4th Cir. 2005).  As a result, this Court should adopt the PSR's calculation of Sabir's offense level, with one exception.

### C.    Sabir Should Receive A Two-Level Upward Adjustment For Obstruction Of Justice

In the PSR, the Probation Office described the numerous instances of perjury committed by Sabir at trial.  (PSR ¶¶ 74-81).  However, the PSR declined to assess an enhancement for obstruction of justice, deferring to the Court on that question.  (PSR at 38).

Section 3C1.1 provides for a two-level upward adjustment where the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant

9

offense of conviction," and "the obstructive conduct related to the defendant's offense of conviction."  U.S.S.G. § 3C1.1.  Application Note 4 specifically includes "committing, suborning, or attempting to suborn perjury" and "providing materially false information to a judge or magistrate" as falling within this provision.  Application Note 2 advises that "[i]n applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."  In this case, Sabir's testimony at trial was not the product of any mistake or faulty memory; it was a deliberate, calculated effort to lie his way out of a conviction.

"[W]hen a defendant objects to a § 3C1.1 enhancement based on trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition."  *United States* v. *Canova*, 412 F.3d 331, 357 (2d Cir. 2005) (quotation omitted).  As a result, "to base a § 3C1.1 enhancement upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *Id.* (quotation omitted).  The court is "further required to find that the perjury had been committed with the specific intent to obstruct justice."  *Id.*

Sabir's trial perjury satisfies these requirements.  In each instance of perjury, Sabir was attempting to contradict or explain away incriminating evidence that could have

10

contributed to the jury's decision to convict him.  First, Sabir testified that he speaks very little Arabic, "one or two small phrases."  (Tr. 1480).  In fact, the trial evidence revealed that Sabir knows the meaning of many Arabic words and phrases, and included examples of Sabir reading and writing Arabic, and of classes he took to learn Arabic.  Although the Government never claimed that Sabir was fluent, the evidence showed that his comprehension is quite good.  Indeed, Ali Soufan, a native Arabic speaker, noted how impressed he was with Sabir's Arabic comprehension.  This claim was material because, if believed, the jury could have doubted Sabir's understanding of many statements made during the May 20, 2005, meeting.

Second, Sabir testified that he never spoke to his best friend, Tarik Shah, about Ali before Sabir met Ali on May 20, 2005.  (Tr. 1480).  This claim is contradicted by numerous recorded conversations involving Shah, the confidential informant Saeed, and the undercover agent.  In one such discussion, which took place shortly after Shah returned from his meeting with Ali in Plattsburgh, Shah noted that Sabir had just visited Shah in New York, and that the two had had the opportunity to talk.  Shah had met Ali more than a year before Sabir met Ali, and Shah and Sabir spoke constantly on the telephone and met in person in New York several times; Sabir even stayed at Shah's house, rather than a hotel, when Sabir visited.  Sabir's effort to distance himself from any knowledge of Ali went to a significant aspect of the proof against him.

11

Third, Sabir testified that he did not know that he was pledging allegiance to Osama bin Laden and al Qaeda when he took "bayat" during the May 20 meeting.  (Tr. 1482).  But the conversation that occurred that day between Shah, Sabir, and Ali mentioned "Sheikh Osama" numerous times, and Ali specifically invoked al Qaeda during the pledge ceremony nearly a dozen times.  The evidence providing Sabir's militant interpretation of Islam supports the conclusion clearly drawn by the jury, i.e., that Sabir knew that Ali was referring to the al Qaeda terrorist organization during the bayat pledge, and lied about it on the stand.

Fourth, Sabir testified that he did not understand the significance of pledging bayat to al Qaeda.  (Tr. 1485).  Sabir contradicted himself on this point in his own testimony. He admitted knowledge of the general concept of bayat, its historical underpinnings, and its significance to Muslims.  Yet, when asked about bayat as it related to Osama bin Laden and al Qaeda, Sabir professed ignorance, and compared it in significance to buying a new car.

Fifth, Sabir testified that he did not know that the repeated references by Ali to "Sheikh Osama" referred to Osama bin Laden.  (Tr. 1489-90).  The context of the discussions on May 20, 2005, make perfectly clear the nature of those references.  The three men are discussing armed jihad, military operations, and the difficulty of controlling overzealous "brothers" who conduct unapproved operations.  They refer repeatedly to Afghanistan and the Middle East.  Shah and Ali have previously had extended

12

conversations about the specific types of jihad training that Ali can arrange in Pakistan. Finally, Sabir expressed no misunderstanding on the tape recording of the meeting when Ali mentioned "Sheikh Osama."  Again, this perjury was material in that, if believed, the jury could have concluded that Sabir lack the necessary intent to provide material support to the al Qaeda terrorist organization.

Sixth, Sabir testified that when Ali pronounced "al Qaeda," he did so in an Arabic accent so strong that Sabir did not recognize that Ali was invoking the terrorist organization.  (Tr. 1490).  This makes no sense.  Although an Arabic speaker may give a somewhat different inflection to the term "al Qaeda" than would a native English speaker, when the term is repeated multiple times, as it was in the May 20, 2005 meeting, in a context in which "Osama" and "Ayman Zawahiri" are also mentioned, there is no question that the participants knew that "al Qaeda" as pronounced by Ali referred to the al Qaeda terrorist organization.  In his sentencing submission to this Court, Sabir now claims that he thought Ali was saying "al aqeeda" during the bayat pledge, which he says "means the basic set of religious beliefs to which one adheres."  (Sabir Ltr. at 3).  Yet, even having had more than two years to contemplate that issue, Sabir never raised any such claim during his extensive testimony at trial.  On direct examination, Sabir claimed only that "I didn't know what [Ali] was talking about."  (Tr. 1490).  Sabir's belated attempt to explain away the obvious conclusion drawn by the jury is further evidence of

13

his perjury at trial, and supports the conclusion that an obstruction of justice enhancement is warranted.

Seventh, Sabir testified that he thought Ali's references to "mujahideen" related to the people of Iraq. This explanation cannot be squared with the factual scenario. Sabir was about to leave for Saudi Arabia, not Iraq. There was no reason to believe that Sabir would have any contact with the insurgents in Iraq, or any ability to even go to Iraq. By contrast, Saudi Arabia was torn by violence engineered by al Qaeda, which publicly took credit for various attacks. Sabir was in a position to meet and aid the "mujahideen" in Saudi Arabia, where he was about to go, and his claim about Iraq was nothing less than a fabrication.

Sabir's repeated instances of perjury during his trial testimony support the conclusion that he intended to obstruct justice. By lying about material matters on multiple occasions, Sabir acted with the specific intent to obstruct the administration of justice by preventing his own conviction. As a result, the Government requests the Court to make the factual findings required to support and apply the two-level enhancement of § 3C1.1.

Applying that enhancement, as well as the adjustment from § 2M5.3, the proper adjusted offense level is 42, and the Criminal History Category is VI, resulting in a Sentencing Guidelines range of 360 months to life. Pursuant to §§ 5G1.1 and 5G1.2, because the statutory maximum sentence is 360 months, the "range" becomes simply 360

months, and § 5G1.2(d) provides that the sentencing court should impose consecutive sentences on Counts One and Two "to the extent necessary to produce a combined sentence equal to the total punishment."  U.S.S.G. § 5G1.2(d).

### D.    Sabir's Substantive Objections To The PSR Should Be Denied

Sabir objects to numerous paragraphs of the PSR, but those objections that relate to substantive matters should be denied because the evidence at trial supports the PSR's content.

Paragraph 15 states that Shah and Sabir "engaged in multiple meetings and conversations in which they discussed providing material support to al Qaeda."  Sabir objects, claiming that "Tarik Shah never discussed providing material support to al Qaeda with Dr. Sabir."  (Wilford Ltr. at 7-8).  The evidence proved that, after meeting Ali in Plattsburgh, Shah discussed Ali with Sabir in March and April 2004.  Shah was recorded talking with Saeed, the confidential informant, about his need to discuss the matter with Sabir, and then advising Saeed that he had spoken to Sabir when Sabir had come to New York for a visit.  Further, the evidence proved the extremely close relationship between Shah and Sabir, to which Shah repeatedly referred in the recorded conversations, calling Sabir his "brother" and saying "we more than twenty years tight."

Paragraphs 75 through 79 relate to Sabir's perjurious trial testimony, which is discussed above.

Paragraph 86 relates to the applicability of the two-level enhancement from § 2M5.3(b)(1)(E), which is discussed above.

The Government has no information regarding Sabir's objections to paragraphs 108 and 109.

The Government agrees that the word "secular" in paragraph 116 should be replaced with "religious."

The Government does not object to Sabir's suggested modification in paragraph 126.

Sabir objects to paragraph 127 as somehow violating a privileged relationship between Sabir and the psychiatrist, Dr. Hill.  (Wilford Ltr. at 8.)  However, paragraph 127 repeats only that information placed into the public record by the defendant as part of his motion to admit expert testimony.  No privileged material is divulged, and so the objection should be overruled.

## E.    No Downward Departures Within The Guidelines Apply

The Probation Office notes no grounds that would warrant a downward departure within the Sentencing Guidelines, and Sabir does not argue for one.

## IV.  The Factors Set Forth in Section 3553(a) Warrant a Sentence Substantially Greater Than 180 Months

The factors set forth in 18 U.S.C. § 3553(a) support the imposition of a sentence substantially greater than the 180-month sentences imposed on co-defendants Shah and Brent.  Sabir was convicted on two counts of violating 18 U.S.C. § 2339B, and, unlike his

16

codefendants, has not admitted or accepted responsibility for his conduct, and perjured himself at trial.

**A.      Sabir's Conditions Of Confinement Do Not Warrant A Reduced Sentence**

Sabir argues that, independent of the § 3553(a) factors, the conditions of his confinement since his arrest warrant a reduced sentence.  They do not.

Sabir has been housed in the segregation unit on 10 South of the Metropolitan Correctional Center ("MCC") since his arrest in May 2005.  His placement in and continued assignment to that unit was determined by the Bureau of Prisons, in the exercise of their obligation to maintain safety and order within prison facilities.  The United States Attorney's Office did not request that Sabir be placed in segregation, nor did the Attorney General impose Special Administrative Measures on Sabir limiting his communications.  As this Court will recall, Sabir sought administrative relief from his assignment to 10 South, but the BOP determined that the nature of his offense and the risks associated with his placement in general population warranted his continued designation to that wing.

Courts considering downward departure requests based on conditions of confinement have recognized that, to warrant a reduction, those conditions would need to be "extreme to an exceptional degree and the[] severity [of the conditions would need to] fall[] upon the defendant in some highly unique or disproportionate manner."  *United States* v. *Teyer*, 322 F. Supp. 2d 359, 377 (S.D.N.Y. 2004) (quotations omitted); *see also*

17

*United States* v. *Mateo*, 299 F. Supp. 2d 201, 207-12 (S.D.N.Y. 2004) (granting downward departure where pretrial detainee experienced sexual abuse by prison guard and birth of child without medical attention); *United States* v. *Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001) (granting downward departure where pretrial detainee suffered "extraordinary stress and fear for his safety" as a result of being subjected for extended period to "qualitatively different, substandard conditions" prevailing at overcrowded, unsanitary and unsafe state correctional facility).  In this case, Sabir cannot demonstrate that his confinement conditions at the MCC, while undoubtedly difficult, approach the extreme and severe level necessary to justify a reduction in his sentence.  Although Sabir is held in a single-person cell, he has regular contact with prison staff, including counselors, religious advisors, and guards; any suggestion that Sabir is cut off from human contact is inconsistent with the facts.  Sabir also gets telephone calls to family members, and, tellingly, unlimited visits and calls with his attorneys.  To the extent that Sabir suffers from medical problems, the prison medical staff has been responsive to his concerns and has provided him with appropriate medication.  Sabir's conditions of confinement do not warrant a lower sentence than the Court would otherwise impose.

**B.    The Nature and Circumstances of the Offense and Sabir's History**

The nature and circumstances of the offense weigh overwhelmingly in favor of a substantial sentence.  Sabir's criminal actions include conspiring with Tarik Shah to offer themselves to help al Qaeda, with Shah agreeing to serve as a martial arts trainer helping

18

jihadists prepare for terrorist operations to kill Americans and their allies, and Sabir agreeing to serve as essentially an on-call medic, available to treat their injuries and help them return to their activities. And Sabir did more than just agree to help; he took steps to put that agreement into action. Sabir gave his Saudi Arabia telephone number to a man Sabir believed to be an al Qaeda recruiter, and urged that man to put the mujahideen in touch with Sabir, because Sabir wanted to meet them. Sabir swore an oath of loyalty to al Qaeda and Osama bin Laden, knowing the deep significance of that act. There can be no question that Sabir's crimes fall comfortably within the heartland of the terrorism-related activities that Congress has sought to punish severely and deter. Indeed, for al Qaeda's terrorist mission to succeed, it needs doctors like Sabir, who can help tend the wounds of its fighters. Sabir's conduct is therefore fully deserving of a sentence well in excess of the 180-month sentences imposed on his codefendants.

**C.   The Need For The Sentence Imposed To:**

**1.   Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

As explained above, terrorism offenses are among the most serious crimes prosecuted by the federal government. That Sabir himself did not take up arms against Americans does not diminish the gravity of his crimes. Shah and Sabir were prepared to help the world's worst terrorists if given the chance; only the doggedness of the New York Joint Terrorism Task Force ensured that they would offer their services first to an undercover agent, rather than to a real terrorist recruiter. Sabir was given multiple

19

opportunities to change his mind, multiple chances to walk away or at least demur, but he

did not.  He decided to follow the path that he and Shah had always sought, the path of

jihad.  Such serious crimes demand harsh punishment.  The United States Sentencing

Commission emphasizes the severity of these crimes in its calculation of the appropriate

Sentencing Guidelines, which results in the second-highest range possible for any offense

or offender.  A sentence that properly reflects the seriousness of the offense, promotes

respect for the law, and provides just punishment must be substantially higher than 180

months.

### 2.    Afford Adequate Deterrence

A sentence substantially greater than 180 months is necessary to deter others with

similar sympathies.  Supporters of terrorism may try to rationalize their conduct by

claiming that they are less culpable because they do not build bombs or plot attacks.  But

those bombs cannot be built without materials, and those attacks cannot be plotted

without funds and assistance.  Deterrence of those who would otherwise aid the terrorists'

efforts helps restrict the flow of funds and other support, thereby making operations more

difficult, and consequently preserving the lives of the terrorists' would-be targets and the

property they would otherwise destroy.  A substantial sentence would deter others who

would follow Sabir's path.

### 3.    Protect the Public from Further Crimes of the Defendant

The evidence at trial demonstrated Sabir's deeply-held views regarding militant, fundamentalist Islam.  There is no reason to believe that Sabir, a sworn member of al Qaeda who jumped at the chance to assist its mission, has reformed such that a less severe sentence is warranted.

> **4.    Provide Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

Sabir is a Columbia-educated medical doctor, and needs no further educational or vocational training.  And the BOP can provide any medical care that Sabir needs.  So this factor should be irrelevant to the Court's analysis of the appropriate sentence.

### D.    The Kinds of Sentences Available

This factor is not at issue because Sabir is facing mandatory imprisonment.

### E.    The Kinds of Sentence and the Sentencing Range Established in the Sentencing Guidelines

This factor weighs heavily in favor of a very substantial sentence.  As explained above, Sabir's Sentencing Guidelines range is 360 months to life, reflecting the Commission's evaluation of the sentence appropriate for such conduct.

### F.    Pertinent Policy Statements Issued by the Sentencing Commission

The policy statements issued by the Sentencing Commission supports its guideline range of 360 months to life.

### G.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

21

Typically, the individuals most similarly situated to a particular defendant tend to be his co-defendants, who are often charged with the same or similar conduct. All three of Sabir's co-defendants in the original indictment have been sentenced. Tarik Shah and Mahmud Brent each pleaded guilty to one count of material support with a stipulated sentence of 180 months, and each was sentenced to 180 months. Abdulrahman Farhane, who was charged in the same indictment as Sabir and ultimately pleaded guilty to money laundering and false statements charges, received a sentence of 13 years' imprisonment.

A sentence substantially above the 180 months imposed on Shah and Brent would not represent an *unwarranted* disparity, but rather a fully appropriate one. Shah, Brent, and Farhane each pled guilty, acknowledging their conduct and accepting responsibility for their crimes. Further, each of those defendants agreed to waive any appeals or other challenges to their sentences.[1] By pleading guilty, those defendants allowed the Government to reallocate its resources to other criminal investigations and prosecutions.

A sentence substantially greater than 180 months would not "punish" Sabir for electing to go to trial. Rather, his codefendants received a substantial benefit by agreeing to plead guilty. The Government received benefits as well. Those guilty pleas resolved the litigation as to those defendants, ensuring a conviction and substantial prison sentence, and also reassured the public that the Government's prosecution of those individuals was warranted. By contrast, Sabir has consistently refused to take

---

[1] Farhane has nonetheless filed an appeal of his sentence.

responsibility for his conduct, a stance that continues to this sentencing, as evidenced by his sentencing submission.  More practically, Sabir was convicted of two material support counts, whereas his codefendants plead guilty to just one.  As a result, a sentence substantially greater than that imposed on Shah and Brent would not represent an unwarranted disparity between them.

In its recent submission in anticipation of the Tarik Shah sentencing, the Government submitted a nonexhaustive survey of several sentences imposed for material support convictions.  That recitation demonstrates that a sentence substantially above 180 months would be commensurate with the sentences imposed on other defendants convicted after trial for similar offenses.  *See, e.g.*, *United States* v. *Paracha*, 03 Cr. 1197 (SHS) (S.D.N.Y.) (material support conviction at trial resulted in 30-year sentence); *United States* v. *Abu Ali*, No. Crim.A. 05-53-GBL (E.D. Va.) (material support conviction at trial resulted in 30-year sentence); *United States* v. *Haouari*, S4 00 Cr. 15 (JFK) (S.D.N.Y.) (material support conviction at trial resulted in 24-year sentence); *United States* v. *Khan*, No. Crim. 03-296-A (E.D. Va.) (material support convictions at trial for various members of Virginia Jihad network resulted in sentences of 10 years for material support counts, in addition to sentences ranging from 55 years to life on other counts); *United States* v. *al-Moayad and Zayed*, (E.D.N.Y.) (material support and other convictions at trial resulted in sentences of 75 years and 45 years, respectively); *United*

*States* v. *Lakhani*, (D.N.J.) (material support and other convictions at trial resulted in sentence of 47 years).

This list does not account for every material support sentence in the United States, and there are certainly some defendants (including many who have signed cooperation agreements with the Government) who have received lesser sentences.  What this non-exhaustive sampling does convey, however, is that courts tend to treat such cases very seriously, imposing lengthy prison sentences on those defendants conspiring or attempting to provide, or providing material support to a terrorist organization – defendants who are similarly situated to Sabir.

**H.    The Need to Provide Restitution to Any Victims of the Offense**

Restitution is not an issue in this case.

## CONCLUSION

For all of the foregoing reasons, the Court should sentence Sabir to a term of imprisonment substantially in excess of 180 months.

Dated:        New York, New York
              November 14, 2007

                                   Respectfully submitted,

                                   MICHAEL J. GARCIA
                                   United States Attorney


                                   _____

                                   JENNIFER G. RODGERS
                                   KARL METZNER
                                   Assistant United States Attorneys
                                   (212) 637-2513/2476

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct electronic copy of the foregoing was served by electronic mail on Edward Wilford, Esq., counsel for defendant Rafiq Sabir, on November 14, 2007.


\_\_\_\_/s/_____
KARL METZNER